Good morning, your honor. You may proceed. My name is Karen Bucher and I represent the appellant Roberto Lopez-Villegas. And may I start with the first question that the court issued on February 3rd? There are three reasons why the answer to the first question is no. First, no reasonable jury could find proof of alienage beyond reasonable doubt just by listening to the audio disc because the group's nonverbal lack of response on an audio tape to the judge's question made it impossible for any jury to determine whether the defendant personally heard the question, understood the question, or whether the non-gesture of not raising his hand was a purposeful response to the judge's question. In other words, on this audio record, the jury could not tell if he knowingly, purposefully, and voluntarily gave response to the judge's question. The second reason is that the circuit has already found that group deportation hearings that require a group response violates due process because you can't tell whether the defendant made an individual decision or a purposeful answer. And if a group deportation hearing violated due process rights, then that tape shouldn't be used in a subsequent criminal proceeding. At the time, your client was questioned by immigration officials. A determination had been made by relevant authority that the response that he gave would not result in a prosecution for that entry. Is that correct? That's correct, Your Honor. Does that make any difference for our purposes? No, because you can't hide behind, you know, label them as... They weren't hiding. They said we've determined for whatever reason to exercise our discretion and not prosecute you. And indeed, they're not attempting to prosecute him based on that entry. Well, the test is whether or not Agent Lopez knew or should have known that the responses to his questioning would elicit an incriminating response. In a future crime, I mean, normally the questioning happens after the crime is committed and the question is, is he being forced to incriminate himself for past conduct? But here the statement was extracted before he committed the crime. He could have desisted from committing the crime. He didn't have to come back to the United States. No, the difference is, Your Honor, he had already committed the crime right then. Yeah, but they're not prosecuting for that crime. No. They're not prosecuting for that crime. They didn't ask him anything about that crime. They only asked him, are you a citizen? Or will you admit that you're not a U.S. citizen? And he said he didn't. He did. And at that point, there was no conduct for which he was being prosecuted. But still the response was still incriminating. The prosecution could have changed its mind. Well, if it did, then you could have a different case. Then you could suppress. But at the time, the objective evidence is that they did not prosecute him for that. He left, and he came back in later. So, David, you're suggesting that every time they ask any immigrant a question about where their birthplace is, it's interrogation because most of these happen after they've committed the crime of illegal entry. Isn't that correct? Well, at the moment, he was still a spokesperson. I'm sorry. I asked a question. Isn't that correct? Isn't that correct, that this kind of questioning that they're doing will be of people who have committed a crime, which is illegal entry? Yes, Your Honor. So what you're saying is that in this, what you're asking us to say then is in this, what is a routine practice, that they must be given Miranda warnings before any of that can proceed. Yes, because at that moment in time, he's still exposed to criminal liability. The moment that he spoke those words to Agent Lopez, he was exposed to criminal liability. He already committed those offenses, and they could have changed their mind. Well, if they did, then they could move to suppress because then the argument would be they knew that they were basically asking questions for purposes of or used the answers for purposes if he is in custody, and we can assume he was in custody in this case, then that would be the remedy there. But why is it a problem later on when all they're, at this point, the purpose of the interrogation or the questioning is not to establish information to prosecute, but rather to find out whether they should be deported? Because at the time the questions were asked, he was exposed to criminal liability. We're going in circles. I understand. So you're just saying what authority do you have in our circuit to support the notion that someone who has been picked up and is in the process of being questioned like this is automatically deemed an interrogation because they are exposed to prosecution, whether or not they are, in fact, going to be prosecuted? Well, in the Sagado case, the defendant was in custody on state charges. Right. And unrelated state charges. Right. And he told the police that he was from another country. Right. So at that point, he had admitted to being illegally in the country. Right. But he wasn't prosecuted for that. No. And then the INS agent that interviewed him, she had no idea that he had. Well, she had no idea, but he was, in fact, subject to prosecution. And I think the focus on these cases I read in is whether or not they're exposed to 1326 liability. Well, 1326 is when you come in later. 1325 is on the initial, isn't it? Wouldn't it have been 1325, prosecution? Yes. In Sagado, if that questioning had resulted in a prosecution, because it wasn't an illegal reentry. It was an illegal entry. That's correct. And it was not prosecuted. And so the issue in Sagado then came along and they said, well, you know, he was questioned. There's a big gap in time. And he comes back in sometime later, takes independent action, comes across, and they used that prior questioning against him. How is that different from this case? Well, again, in the case Mata Impundis, the case out of Washington, when the criminal investigator was interviewing the defendant, he had known that he was possessing he possessed a gun and he was an illegal alien. And just that knowledge right then and there, he was exposed to criminal liability. The government there didn't have to prosecute him, but the fact that they could. I'm trying to imagine how the Miranda warning would go in this circumstance at the third step. Anything you say won't be used against you for this entry, but could be used against you in a future prosecution? Would you have to alter the traditional Miranda rubric? I don't know if I would alter it. If you didn't alter it, wouldn't the warning be inaccurate? I mean, if you tell the person anything you say can and will be used against you, that is the third prong of the Miranda warning, isn't it? Yes. Well, that would be inaccurate in this circumstance, wouldn't it? I suppose you could qualify it. But still, the test by reading all these cases is at the moment you're asking the question if it's incriminating, whether or not the government decides to prosecute, it's irrelevant. Even despite Salgado? Well, the agent in Salgado did not know about this test. Wait a minute, that's her subjective view at the time, okay? But it's incriminating. It is incriminating, and the questioner in this case had a subjective belief that they were not going to prosecute him for illegal entry or reentry. In our case, that stayed a mine. So if you were looking at objective evidence, you look to the fact of what did they do, and in Salgado and in this case where the questioning took place, neither was prosecuted for illegal entry. It's only later that they were interrogated, I mean, came across and was used against them. That's what I'm trying to understand where you're drawing the line here. See, I think in Salgado they were concentrated on the 1326 violation, not the 1325. So when she was interviewing him at the time, she didn't have the A file. It appeared she didn't have the A file or any of this information that he had prior deportation. Okay, let's suppose she asked the question and he said, and then she turned around and initiated the steps to prosecute him for illegal entry at that time. Could she have done so? It would not have been a problem with the questioning. It would not have been interrogation. She could use his incriminating admission, and they did, in fact. It depends on what she knew in advance. So you're saying what the questioner knows should have known. Thank you. Good morning. I'm Sabrina Feb from the United States. This case is on all fours with Salgado. And, in fact, the facts that are before you with this case are stronger and favor the outcome of Salgado even more than the facts of Salgado. One thing I'd like to point out that I think is a little ambiguous in the record of Salgado is that it does appear that Salgado himself could have been prosecuted for 1326 when he was interviewed in 1998 by the immigration officer. What we know from Salgado and the case is that he had, in 1999, five records of being a previously removed alien, and he also had several certified conviction documents. What that suggests is that even if one of those removal documents pertained to his 1998 removal, he had still been removed at least three times before he was interviewed by that agent in 1998. If the immigration officer were being completely candid with this individual, wouldn't he have had to say, I'm now going to ask you a question if the answer is what I anticipate? It will provide the element for a future prosecution should you reenter. Is that an – maybe it doesn't matter, but is that with regard to this case or the interview that happened in Salgado in 1998? This case. No, Your Honor. I don't think it does, because right now there was a time, as you probably recall, when 1326 required an alien to be warned before – in order for us to thereafter prosecute him for illegal reentry. That's no longer the case. And Miranda isn't put into place in order to let people know that they could be in trouble for something later on. It's to tell them it's a palliative designed to protect their Fifth Amendment right against incriminating themselves. Any part of the interview with Lopez was he told, in essence, we're giving you a break this time, but if you reenter, what you're telling me will be used against you. No, and I think that's because the agent who interviewed him, Agent Lopez, is there only in an administrative capacity. So the agent was Lopez and the defendant is Lopez. Yes, Your Honor. Okay. So Agent Lopez, when he sat down with Mr. Lopez-Villegas, had no reason to be thinking about the criminal proceedings, because his sole responsibility was to make sure that federal immigration laws were properly implemented. And that's what he did, and that's why he asked those questions. And I'm sorry, what is the administrative reason for asking that particular question? Because the immigration officers have an affirmative obligation to try and find out whether or not the person they're interviewing would have a claim to derivative citizenship, and that's why they ask about where your parents were born. So that was why he was asking those questions. I understand that what we all know in this room is that everyone who's interviewed could potentially have those statements used against him or her later on if they choose to violate the U.S. immigration laws. But those facts are very similar in some ways to the facts that this Court discussed in Orozco-Acosta, where they talked about the warrant of removal. And one of the things that the Court pointed to in that decision was the fact that a little bit less than 3% of people who are processed for removal are subsequently prosecuted for illegal reentry. And so that's not a real risk, and it's not something that anyone has seen fit to ask these administrative officers to bear in mind and to bootstrap into their administrative proceedings. What happens if, in one of these proceedings, if the suspected alien, I guess he is a suspected alien because you're asking questions that might turn up that he's not. It turns out his mother is American. Anyway, but right now he's a suspected alien. Let's say he refused to talk. He says, I'm not talking. I'm just wondering what happens in that situation. That is his right. One of the differences between... I understand this is his right, but what happens if he exercises that right? Then the United States can move forward and remove him because what the immigration officer will document is that he tried in good faith to comply with the U.S. law that requires him to try and make sure that someone is not being incorrectly removed. So let me just rephrase my question slightly. There's no detriment that the suspect, let's call him, the suspected alien, suffers. If he doesn't want to answer questions, he won't get prosecuted or treated badly or they'll say, you know, if you answer these questions, we'll push him the next bus back. But if you don't answer the questions, we'll, you know, we may keep you in detention for a while. I mean, anything bad happen? There is, yes, because unlike in the criminal proceeding where the alien has no burden of proof before the defendant has no burden of proof, he or she does have a burden of proof once the United States has made a prima facie showing that creates a rebuttable presumption. And so here silence would be detrimental to the alien because it's at that point that he or she, if they do wish to remain in the United States and don't wish to be removed, it is incumbent upon him or her to put forth whatever... I understand that, but most of them don't have anything to say that will help them stay in the United States. Most of them want to be, you know, they're caught. I assume that they want to be sent back as soon as possible with as little difficulty as possible, you know, as swiftly and painlessly as possible because they don't have any legal basis for staying. Is that process impaired if you don't answer the questions? Do they stick you in the pokey for a while and let you cool your heels? I wonder if there's any pressure to answer the questions. I think, Your Honor, as my understanding of the proceedings, the only pressure is if you want to stay here, then you should say something or you need to say something. If you don't want to be here, there's no pressure to say anything because it seems that you're happy with the outcome that this proceeding is now swiftly moving forward. So the questions are designed, if anything, to help you stay here. Yes. And if you don't say anything affirmative to help you stay here? Yes, Your Honor. You get moved out. That's correct. And so that also feeds into part of why— They don't send you to Guantanamo or anything like that? I don't believe he goes to Guantanamo. Okay, I just—just checking. I have not had any 1326s or anything from Guantanamo. Okay, just— But it's because of this affirmative obligation that Salgado was a very important decision for how we do our job and how the immigration officers do their job because there is a need to make sure that there's as much candor as possible between the interviewing agent who's there for an administrative purpose and the alien, which is not the case here. And so that's why Salgado's on all fours. And if you have no further questions on Salgado, I'll submit on the briefs. And then if you would like, I'm happy to address the question that you emailed us. I think we're fine. Thank you. Thank you. Ms. Booker, you're out of time. We'll give you a minute for a bottle if you should take it. Your Honor, I have nothing further unless there's questions. Okay. Thank you. Thank you. The case is signed. You will stand submitted. We'll next hear an argument in Moreno v. Estruz.
judges: Kozinski, Hawkins, Fisher